In the

# United States Court of Appeals
### For the Seventh Circuit

_____

No. 05-2749

JOAN LASKOWSKI and DANIEL M. COOK,

*Plaintiffs-Appellants,*

*v.*

MARGARET SPELLINGS, Secretary of Education,

*Defendant-Appellee,*

and

UNIVERSITY OF NOTRE DAME,

*Intervenor-Defendant/Appellee.*

_____

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:03-cv-1810-WTL—**Larry J. McKinney**, *Chief Judge.*

_____

ARGUED JANUARY 9, 2006—DECIDED APRIL 13, 2006

_____

Before POSNER, EVANS, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge.* This is a taxpayer suit, originally to enjoin a grant by the Secretary of Education of money to the University of Notre Dame to be used for a program called Alliance for Catholic Education (ACE). A congressional

appropriation for fiscal year 2000 had earmarked $500,000 to be given Notre Dame for redistribution to several other religious colleges in order to enable them to replicate the ACE program on their own campuses. Consolidated Appropriations Act, 2000, 113 Stat. 1501, 1501A-262 (Nov. 29, 1999). The complaint alleges that the grant violated the First Amendment's prohibition against Congress's creating religious establishments, a prohibition that the Supreme Court has interpreted to encompass any direct financial support by the government of religious activities. Notre Dame was permitted to intervene in the case in the district court as a defendant.

ACE is a program for training teachers in Catholic schools. It has three parts—professional development, community life, and spiritual growth. The first part consists of both teacher-training courses and field experience teaching at Catholic elementary and secondary schools. The second consists of the teachers' residing in faith-based communities while doing apprentice teaching in those schools. The third is encouragement of the teachers to live and work in accordance with the tenets of the Catholic faith. Thus, the program has both secular and religious components.

The district court dismissed the suit as moot because Notre Dame had received and spent the grant, a one-time grant in an appropriations bill. It was too late to enjoin the expenditure and the likelihood of a future such earmark was too remote to warrant injunctive relief. *Diffenderfer v. Central Baptist Church of Miami, Fla., Inc.*, 404 U.S. 412, 414-15 (1972) (per curiam); see also *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 478, 481-82 (1990); *Federation of Advertising Industry Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 929-30 (7th Cir. 2003).

We agree that the claim for injunctive relief is moot, but not that the entire case is moot. If $500,000 in federal money was expended by the Secretary of Education (actually slightly less, for reasons unnecessary to explain) in violation of the establishment clause, that expenditure was, in the contemplation of the law, an injury to objecting federal taxpayers. *Freedom from Religion Foundation, Inc. v. Chao*, 433 F.3d 989, 991-92 (7th Cir. 2006), and cases cited there. As explained in our opinion in that case, ordinarily federal taxpayers do not have standing to complain about federal expenditures, but the Supreme Court has carved an exception for cases in which a taxpayer complains that Congress is spending money in violation of the First Amendment's establishment clause. That expenditure is deemed sufficient injury to the taxpayer to allow him to maintain suit in federal court. And so the plaintiffs' case would be moot only if the district court could make no order that would compensate them in whole or in part for the injury consisting of the improper expenditure. We say in whole or "in part" because at argument Notre Dame's lawyer pointed out that insofar as the money has been spent for forbidden purposes, say to indoctrinate teachers or students in Catholic dogma, that injury cannot be rectified. What can be rectified, however, is the depletion of the federal treasury by the amount of the grant. It can be rectified simply by the restoration of the money to the U.S. Treasury. That is "meaningful relief," as assumed in *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 767 n. 23 (1976) (plurality opinion), which is all the relief that need be possible to avert a finding of mootness. *Church of Scientology v. United States*, 506 U.S. 9, 12-13 (1992); *Calderon v. Moore*, 518 U.S. 149, 150 (1996) (per curiam); *In re Resource Technology Corp.*, 430 F.3d 884, 886-87 (7th Cir. 2005); *In re Envirodyne Industries, Inc.*, 29 F.3d 301, 303-04 (7th Cir. 1994).

If Congress created a continuing program of expenditures challenged as violating the establishment clause—a program, say that consisted of annual $1 million grants to the Scottish Episcopal Church to pay the salaries of its ministers—it could be enjoined and in that way injury averted. But suppose Congress by an amendment to an appropriate bill earmarked $100 million for the Scottish Episcopal Church and the money was disbursed by the Department of the Treasury the following day. An injunction against the disbursement would come too late to provide any relief to the complaining taxpayers. The only feasible relief would be monetary. We cannot think of any reason why such relief should not be possible. Restitution is a standard remedy and one ordered in public-law as well as private-law cases. See, e.g., *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 203-05 (1967); *United States v. P/B STCO 213*, 756 F.2d 364, 374 (5th Cir. 1985).

This point has been obscured by a debate among the parties over whether the Secretary of Education can be made to order Notre Dame to restore the money to the Treasury. The Secretary is authorized to seek repayment of a grant diverted to sectarian purposes in violation of the Constitution and a Department of Education regulation. 34 C.F.R. § 75.532; see 31 U.S.C. §§ 3701(b)(1)(C), 3711(a)(1); 34 C.F.R. § 74.73(a). But courts are not authorized to review a decision not to take an enforcement action; such decisions are within the absolute discretion of the enforcement agency. *Heckler v. Chaney*, 470 U.S. 821, 831-33 (1985); see also *City of Chicago v. Morales*, 527 U.S. 41, 62 n. 32 (1999). Otherwise courts would take over the prosecutorial function, making decisions, well outside judicial competence, about the best allocation of limited enforcement resources.

The suggested procedure of ordering the Secretary to order Notre Dame to repay the grant money is not only unauthorized but also needlessly complex. If the plaintiffs prevail on the merits, the district court can simply order Notre Dame to return the money to the treasury. Notre Dame objects that as a private entity it is incapable of violating the establishment clause, which like most provisions of the Constitution is a limitation on the power of government, not of private entities. But if as the plaintiffs claim the Department of Education wrongfully took their tax money and gave it to Notre Dame, the court can order Notre Dame to return the money to the U.S. Treasury. It would be like a case of money received by mistake and ordered to be returned to the rightful owner. Such orders are routine instances of restitution. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213-14 (2002); *ConFold Pacific, Inc. v. Polaris Industries, Inc.*, 433 F.3d 952, 957-58 (7th Cir. 2006); *Moriarty v. Larry G. Lewis Funeral Directors Ltd.*, 150 F.3d 773, 777 (7th Cir. 1998); *Landmark Land Co., Inc. v. FDIC*, 256 F.3d 1365, 1378 n. 5 (Fed. Cir. 2001); Douglas Laycock, "The Scope and Significance of Restitution," 67 *Tex. L. Rev.* 1277, 1284 (1989) (a "defendant may be unjustly enriched without having committed any other civil wrong"). And restitution is among the remedies that a federal court can order for a violation of federal law. See, besides the cases cited earlier, *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 290-91 (1960); *Porter v. Warner Holding Co.*, 328 U.S. 395, 398-99 (1946); *United States v. Lane Labs-USA Inc.*, 427 F.3d 219, 225 (3d Cir. 2005); see generally *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 68 (1992).

Against all this it can be argued that the plaintiffs have forfeited any claim to restitution by asking only for injunctive relief. But the argument is incorrect on three grounds.

First, the plaintiffs made clear in the district court that they want the money that was given to Notre Dame and by it funneled to the other Catholic schools returned to the U.S. Treasury. They want the funnel to be an order to the Secretary of Education, but that is merely a detail. Second, Rule 54(c) of the civil rules provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." See, e.g., *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 65-66 (1978); *Old Republic Ins. Co. v. Employers Reinsurance Corp.*, 144 F.3d 1077, 1081-82 (7th Cir. 1998); *Felce v. Fiedler*, 974 F.2d 1484, 1501-02 (7th Cir. 1992); *Powell v. National Board of Medical Examiners*, 364 F.3d 79, 85-86 (2d Cir. 2004); *Z Channel Ltd. Partnership v. Home Box Office, Inc.*, 931 F.2d 1338, 1340-41 (9th Cir. 1991) ("if Z Channel is entitled to collect damages in the event that it succeeds on the merits, the case does not become moot even though declaratory and injunctive relief are no longer of any use"); 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2664 (3d ed. 1998). The reason for this sensible rule is that in the course of a litigation circumstances may change and what initially seemed adequate relief may cease to be so. See *Minyard Enterprises, Inc. v. Southeastern Chemical & Solvent Co.*, 184 F.3d 373, 385-86 (4th Cir. 1999); *Z Channel Ltd. Partnership v. Home Box Office, Inc.*, *supra*, 931 F.2d at 1340-41. But third, the plaintiffs are not actually seeking monetary relief, in the usual sense, against Notre Dame. When a plaintiff seeks monetary relief, he is seeking payment by the defendant to himself, not to another. These plaintiffs are asking that the district court order Notre Dame to repay the U.S. Treasury. Originally they wanted the district court to order the Secretary of Education to order Notre Dame to repay the U.S. Treasury. Now they are

cutting out the middleman. The change in the form of relief sought has no practical significance.

A genuine curiosity is that Notre Dame became a party on its own motion rather than having been named as a defendant by the plaintiffs; and it might seem that to seek restitution from someone other than the alleged wrongdoer does not fit within the scope of Rule 54(c). But remember that the plaintiffs' theory of the case first propounded in the district court was that Notre Dame would have to pay back the grant that it had received, though upon an order issued by the Secretary of Education. Once Notre Dame entered the case to preserve its right to the grant money, the natural remedy, to avoid needless circuity, was an order against it rather than against the Secretary to order Notre Dame to repay the money. For the application of Rule 54(c) in such a context, see *Pension Benefit Guaranty Corp. v. East Dayton Tool & Die Co.*, 14 F.3d 1122, 1127-28 (6th Cir. 1994).

There are defenses to restitution. The recipient of the money sought to be recovered may not have known or have had reason to know that it was receiving money by mistake, and may have relied to its detriment on its honest and reasonable belief that it was legally entitled to the money. Notre Dame did rely to its detriment—it gave the money away. Whether it relied reasonably is a separate question. If it was merely an innocent conduit, neither knowing nor having reason to know that it was receiving an unlawful grant, it would not have to make restitution. *Fidelity National Title Ins. Co. v. Howard Savings Bank*, 436 F.3d 836, 840 (7th Cir. 2006); 1 Dan B. Dobbs, *Law of Remedies: Damages-Equity-Restitution* § 4.6, pp. 656-58 (2d ed. 1993); see, e.g., *Westamerica Securities, Inc. v. Cornelius*, 520 P.2d 1262, 1269-70 (Kan. 1974); *Anita Valley, Inc. v. Bingley*, 279 N.W.2d 37, 40-41 (Iowa 1979). But that remains to be determined.

In denying that the district court can ever order restitution in a case such as this, Notre Dame overreads two decisions in which the Supreme Court denied restitution as a remedy for a violation of the establishment clause: *Roemer v. Board of Public Works*, *supra*, and *Lemon v. Kurtzman*, 411 U.S. 192 (1973) ("*Lemon II*," as it is known). The ground in both cases was that the religious institution had reasonably relied, to its detriment, on the grant's being legal. Reasonable reliance, as we just noted, is a recognized defense to a suit for restitution against someone who is not himself a wrongdoer and who innocently received and spent money to which it turned out he had no right. *Fidelity National Title Ins. Co. v. Intercounty National Title Ins. Co.*, 412 F.3d 745, 751 (7th Cir. 2005); *Harnischfeger Corp. v. Harbor Ins. Co.*, 927 F.2d 974, 978 (7th Cir. 1991); *Equilease Corp. v. Hentz*, 634 F.2d 850, 853-54 (5th Cir. 1981).

But as is plain from the rather tortured opinions (neither of which commanded a majority) in *Roemer* and especially *Lemon II*, and as is even plainer from the opinion in *New York v. Cathedral Academy*, 434 U.S. 125, 130, 133-34 (1977), which rejected a reliance defense in another establishment clause case, there is no per se rule that the recipient of illegal funds who has spent them cannot be forced to repay them, either in establishment clause cases or in any other class of cases. See, e.g., *Messersmith v. G.T. Murray & Co.*, 667 P.2d 655, 657-58 (Wyo. 1983); *Equilease Corp. v. Hentz*, *supra*, 634 F.2d at 854. In any event, the defense of reasonable reliance is not a jurisdictional doctrine, but rather a remedial doctrine that comes into play after liability has been established; and in this case the district court, having dismissed the suit as moot, never reached the merits.

The plaintiffs ask us to do so. They say there's sufficient documentation in the record to prove that the

grant to Notre Dame has been used to fund religious activities. They emphasize the home pages of the four religious colleges to which Notre Dame disbursed the "replication" grant; the pages describe a program having a strong sectarian component. The defendants respond that those pages are hearsay, since the recipients are not parties (if they were, their home pages would not be hearsay, but party admissions). It is a curious argument for several reasons, the most obvious of which is that Notre Dame concedes as it must that the ACE program, its own and its replicators', has a substantial religious component. Moreover, Notre Dame cited the home pages, and therefore presumably vouched for their accuracy, in its reports to the Department of Education on its use of the grant. Even now Notre Dame does not contest the accuracy of the home pages; this makes its objection to their admissibility hollow.

But though admissible, the home pages cannot carry the day for the plaintiffs. All they show is that these institutions, like Notre Dame itself, indeed have an ACE program, and that, as the name implies ("Alliance for Catholic Education") and Notre Dame concedes, the program has a significant religious component. The issue is whether the religious component was financed in whole or part by the grant from the Department of Education. That issue cannot be resolved by reference to the home pages. The ACE programs at the various schools are funded by private donations as well as by the Department of Education. As long as the religious component is financed entirely by the private donations, there is no violation of the establishment clause, which has been interpreted as not forbidding grants of public money to religious institutions as long as the grants are limited to the institutions' secular activities E.g., *Bowen v. Kendrick*, 487 U.S. 589, 608-09 (1988); *Hunt v.*

*McNair*, 413 U.S. 734, 742-43 (1973); *Tilton v. Richardson*, 403 U.S. 672, 679 (1971) (plurality opinion). This is the critical question and it is not answered by the materials in the record.

Other issues as well may become critical on remand. Suppose it turns out that some part of the grant to Notre Dame was used to defray the cost of religious activities at the other schools. Several possibilities would then heave into view. One is that the grant was entirely proper because it contained adequate safeguards against the use of the money for religious activities, e.g., *Bowen v. Kendrick*, *supra*, 487 U.S. at 614-15; *Freedom from Religion Foundation, Inc. v. Bugher*, 249 F.3d 606, 612-13 (7th Cir. 2001); *American Jewish Congress v. Corporation for National & Community Service*, 399 F.3d 351, 358 (D.C. Cir. 2005); *Columbia Union College v. Oliver*, 254 F.3d 496, 506 (4th Cir. 2001)—including safeguards that would prevent the direct recipient, Notre Dame, from allowing the money to be used by the recipient institutions for religious activities—and the grant was simply misused by Notre Dame or the recipient institutions. In that event there would be no violation of the establishment clause and again the case would be at an end, though the Department of Education might have a claim against Notre Dame and the other institutions for violating the terms of the grant, *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756, 776-77, 780 (1973); even a qui tam action would be conceivable.

We do not think that *Agostini v. Felton*, 521 U.S. 203 (1997), abolished the requirement that there be safeguards to prevent the diversion of grants to religious institutions from secular to sectarian activities. In that case a federal program paid for public school teachers to be sent into parochial

schools (as well as other private schools) to teach special-education classes. The teachers were not chosen for this duty on the basis of their religious beliefs or affiliations, and the Court thought the risk that they would smuggle religious instruction into their classes, merely because of the parochial-school setting, was remote. The Court would not "presume that public employees will inculcate religion simply because they happen to be in a sectarian environment. Since we have abandoned the assumption that properly instructed public employees will fail to discharge their duties faithfully, we must also discard the assumption that *pervasive* monitoring of Title I teachers is required. There is no suggestion in the record before us that unannounced monthly visits of public supervisors are insufficient to prevent or to detect inculcation of religion by public employees." *Id*. at 234 (emphasis in original); cf. *Mitchell v. Helms*, 530 U.S. 793, 818-20 (2000) (plurality opinion). Similarly in *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), the school-voucher case, the parents selected the school, so there was no risk that the voucher money would be steered by a religious institution to a religious use. The steering was done by parents, and parents are not religious institutions. *Witters v. Washington Dept. of Services for the Blind*, 474 U.S. 481 (1986), is a similar case.

The situation in *Nyquist* was different. The program at issue there provided, among other things, public funds for the maintenance and repair of private schools, most of them sectarian. The funding was sufficiently generous that a school might be able to finance its entire maintenance and repair expense out of it, in which event there could be no argument that the funds were being used to defray merely the secular activities of the school. Likewise in this case, where money was being given to a religious program with a secular component, it was important that there be some

mechanism for limiting the use of the money to the secular component. It is unclear from the record whether there was an adequate mechanism and if so whether it was used to prevent a diversion to forbidden purposes. *Freedom from Religion Foundation, Inc. v. Bugher*, *supra*, 249 F.3d at 612-14.

Mindful that to insist on too elaborate a monitoring mechanism could inject the government too deeply into the affairs of religious institutions (the dread "entanglement" of which the cases speak), we do not suggest that the Department of Education or Notre Dame was required to institute and operate an elaborate scheme of audits and on-site visits. But given the well-known temptation of educational institutions to divert grants made for one purpose to another that the institution considers more pressing, just writing a check for the support of an explicitly religious program that has a secular component is not enough. See *id*. at 613. This is not to say that religious institutions require greater supervision than other federal grantees. The only relevance of the religious context is that religion is an example of an activity that a grant of federal moneys may not be used to support. Suppose the grant was to Harvard University to support biochemical research. The grantor would want to make the limited scope of the grant clear. It would not just write a check to Harvard, because it would worry that Harvard might arbitrarily allocate a portion of the grant to general university overhead. The grantor would insist that the grant contract contain language designed to prevent such a diversion.

Still another possibility is that the grant was improper because it lacked adequate safeguards but that Notre Dame reasonably believed it proper and was not complicit in any religious spending by the recipient organiza-

tions; such a showing would go far toward establishing the defense of reasonable reliance that we discussed earlier.

And perhaps Notre Dame will want to bring the recipient institutions into the case, since they obtained a more direct benefit than Notre Dame from the allegedly unlawful grant. (Which is not to say that Notre Dame derived no benefit; it doubtless obtains favorable publicity from the replication of its program by other schools. It probably requested the earmark.) All are matters to be sorted out on remand. The suit was dismissed prematurely.

VACATED AND REMANDED.

SYKES, *Circuit Judge,* dissenting. This case is moot. The majority keeps it alive by declaring the availability of a form of restitutionary relief that was not sought by the plaintiff taxpayers and is inconsistent with the doctrine of taxpayer standing under *Flast v. Cohen*, 392 U.S. 83 (1968), a limited exception to the general rule that citizens lack standing to sue in federal court on generalized grievances about the conduct of government. The Supreme Court has steadfastly refused to expand *Flast* and has never recognized private party repayment to the Treasury as an appropriate remedy for an Establishment Clause violation in a suit based on taxpayer standing. *See, e.g., Bowen v. Kendrick*, 487 U.S. 589, 621-22 (1988); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 479-82 (1982); *Roemer v. Bd. of Pub. Works*, 426 U.S. 736, 767 n.23 (1976); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208,

228 (1974); *United States v. Richardson*, 418 U.S. 166, 175 (1974); *Lemon v. Kurtzman*, 411 U.S. 192, 208-09 (1973) (*"Lemon II"*).

Against this backdrop, the majority holds that a recipient of a federal grant may be ordered to repay the grant as a remedy in a taxpayer lawsuit alleging that the government violated the Establishment Clause in making or insufficiently monitoring the grant. The majority achieves this result by importing the common law doctrine of restitution—a private law concept—into the public law realm of Establishment Clause litigation, vesting taxpayers with a unique sort of qui tam-like authority to sue private parties for reimbursement of the Treasury when the government is alleged to have committed an Establishment Clause violation. And the majority does this even though the claim against the government's representative is itself moot, making the newfangled remedy against the grant recipient the sole basis for the taxpayers' standing to pursue the Establishment Clause claim. This is a dramatic expansion of taxpayer standing, and there is no authority for it. I must respectfully dissent.

In December 2003 the plaintiff taxpayers brought this suit against the Secretary of the Department of Education seeking to enjoin payment of a congressional grant awarded in 2000 to the University of Notre Dame for a teacher training program. Called the Alliance for Catholic Education ("ACE"), the program trained teachers to work in Catholic schools serving underprivileged students in poor neighborhoods; it was replicated by Notre Dame at four partner colleges and universities. The taxpayers alleged the ACE grant violated the Establishment Clause and sought injunctive relief enjoining the Secretary to withdraw the Department's approval for it. They did not move for a preliminary

injunction. Notre Dame was permitted to intervene as a defendant, but the plaintiffs did not amend their complaint to assert any alternative or additional form of relief against Notre Dame. More specifically to the point here, the plaintiffs did *not* sue for *any* form of monetary relief.

In 2004, while the suit was still pending in district court, the grant appropriation expired by its own terms. Because it was a one-time only congressional earmark, now expired, and Notre Dame had received and either spent or disbursed the entire grant amount to its ACE partner universities, an ongoing alleged constitutional violation no longer existed. The taxpayers had sued only for prospective injunctive relief, but there was nothing left to enjoin. The district court dismissed the case as moot.

On appeal, the taxpayers concede that their original claim to enjoin the Secretary to withdraw approval for the grant is moot. *See Burke v. Barnes*, 479 U.S. 361, 363 (1987) (a challenge to the validity of a statute is mooted when the statute expires by its own terms); *Diffenderfer v. Cent. Baptist Church of Miami, Fla., Inc.*, 404 U.S. 412, 414-15 (1972); *Fed'n of Adver. Indus. Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 929 (7th Cir. 2003). They insist, however, that the case is not moot because another form of injunctive relief is available should they prevail on the merits. They contend the district court can enjoin the Secretary to seek recoupment of the grant under the Federal Claims Collection Act and Department of Education regulations empowering the Secretary to recover grant money spent in a manner inconsistent with the constitutional and regulatory requirements governing the grant. *See* 31 U.S.C. §§ 3701(b)(1)(C), 3711(a)(1); 34 C.F.R. §§ 74.73(a), 75.532. They assert that this form of relief—an injunction requiring the Secretary to seek recoupment of a misspent grant—is meaningful relief

sufficient to avert a finding of mootness. *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992).

The majority rejects this contention, for good reason. The court has no authority to order the Secretary to seek recoupment from Notre Dame. An agency's decision not to take an enforcement action is within the discretion of the agency and is not reviewable. *See Heckler v. Chaney*, 470 U.S. 821, 831-33 (1985). In addition, federal regulations specifically provide that the Federal Claims Collection Act does not create a private right of action. *See* 31 C.F.R. § 900.8.

The majority thus holds, and I agree, that the taxpayers' claim for injunctive relief is indeed moot. Maj. op. at 3. This should end the matter, because the taxpayers did not sue or argue for any other relief. It is well-settled that when a plaintiff challenges the validity of a statute and seeks *only* prospective injunctive relief, the repeal or expiration of the statute "ends the ongoing controversy." *Fed'n of Adver. Indus. Representatives*, 326 F.3d at 930. In the absence of a damages claim or some basis for application of the voluntary cessation doctrine (not at issue here), the entire case is moot. *Id.* at 929-30. But the majority goes on to hold that the mootness of the injunctive claim does not moot the entire case because "the district court can simply order Notre Dame to return the [grant] money to the treasury" and that such an order would be a "routine instance[ ] of restitution." Maj. op. at 5. To the contrary, such an order would be neither simple nor routine. In the context of a taxpayer suit alleging an Establishment Clause violation, such an order would be extraordinary and unprecedented.

First, it bears repeating that the plaintiff taxpayers did not make a restitution-based argument, either in the district court or on appeal; no monetary claim, restitutionary or

otherwise, was made in this case. A waived claim "cannot supply the residual live controversy necessary to prevent [the plaintiffs'] entire claim from being moot." *Brown v. Bartholomew Consol. Sch. Corp.*, No. 05-1526, 2006 WL 784953, at *9 (7th Cir. Mar. 29, 2006). Needless to say, declaring the existence of a novel compensatory remedy against a private party in a taxpayer lawsuit alleging an Establishment Clause violation is a judicial act of significant import. It should not be undertaken in the absence of an actual claim for this form of relief and full briefing by the parties. *See McNeil v. Wisconsin*, 501 U.S. 171, 181 n.2 (1991) ("What makes a system adversarial rather than inquisitorial is . . . the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties."). Under these circumstances, Notre Dame would be justified to think itself sandbagged; it had no notice and no reason to expect when it moved to intervene that this injunction action might morph into a claim for restitutionary monetary relief on appeal.[1]

---

[1]  The majority responds that the Federal Rules of Civil Procedure generally permit the court to substitute other forms of relief for those originally sought in the pleadings. Maj. op. at 6. This misses the point. To repeat the chronology: the plaintiffs sued the Secretary of Education, not Notre Dame. When Notre Dame intervened to protect its interest in the ongoing grant, the plaintiffs did not seek *any* form of relief against Notre Dame. When the grant expired, raising the mootness question, the plaintiffs argued only that they are entitled to an injunction ordering the Secretary to seek recoupment of the grant, *not* that they are entitled to an order of restitution against Notre Dame. The majority asserts that although the plaintiffs "originally"
(continued...)

Moreover, and perhaps more importantly, adapting the common law doctrine of restitution to fashion a remedy in a taxpayer suit for an alleged Establishment Clause violation is like trying to pound the proverbial square peg into a round hole. Restitution is a private law equitable doctrine that orders liability and remedies between private individuals based on unjust enrichment; it has no application in a suit by taxpayers raising an Establishment Clause challenge to a congressional appropriation. It certainly cannot operate as the sole basis for standing in an otherwise moot taxpayer suit.

The Supreme Court has characterized the doctrine of mootness as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (internal quotations and citations omitted). The Court has also made it clear that "a plaintiff must demonstrate standing separately for each form of relief sought." *Id.* at 185. Although the plaintiff taxpayers did not seek or argue

---

[1] (...continued)
sought a remedy against the Secretary alone, in reality they have been pursuing a remedy against Notre Dame all along and are now just "cutting out the middleman" by "chang[ing] . . . the form of relief sought." Maj. op. at 7. This is untrue. The plaintiffs *never* argued that they are entitled to a restitutionary remedy against Notre Dame. The majority has *sua sponte* injected the theory of restitution into this case, unbidden by the plaintiffs and utterly without support in the taxpayer standing case law. *See infra* pp. 20-28. The rules of procedure do not permit the court to invent a new remedy in favor of plaintiffs who have not requested it in a case that is otherwise moot.

for restitution, the majority holds that Notre Dame can be ordered to return the grant money to the Treasury, and the availability of this restitutionary remedy fore-stalls mootness. Implicit in this holding is a subsidiary one: that taxpayers have standing to sue a private federal grant recipient for restitution where the government is alleged to have committed an Establishment Clause violation in making or monitoring the grant. Taxpayer standing under *Flast* has never been understood to encompass such a claim.

Constitutional standing requires, "at an irreducible minimum," that the party invoking the court's authority "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Valley Forge*, 454 U.S. at 472 (internal quotations and citations omitted); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). These Article III case-or-controversy requirements serve to "limit the federal judicial power 'to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process.' " *Valley Forge*, 454 U.S. at 472 (quoting *Flast*, 392 U.S. at 97).

Generalized grievances by citizens or taxpayers are insufficient to establish standing to challenge a statute in federal court. *Frothingham v. Mellon*, 262 U.S. 447 (1923). The party invoking the power of judicial review "must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." *Id.* at 488. A taxpayer's "interest in the

moneys of the treasury . . . is shared with millions of others [and] is comparatively minute and indeterminable," and the effect of a challenged statute on an individual citizen's tax burden is too "remote, fluctuating and uncertain" to constitute a cognizable injury for standing purposes. *Id.* at 487.

The Supreme Court has deviated from the general rule against taxpayer standing only once, holding in *Flast* that "a taxpayer will be a proper party to allege the unconstitution-ality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8 of the Constitu-tion," and only when the taxpayer can "show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the con-gressional taxing and spending power and not simply that the enactment is generally beyond the powers dele-gated to Congress by Art. I, § 8." *Flast*, 392 U.S. at 102-03. Because the Establishment Clause is a specific limitation on congressional taxing and spending authority, the Court held in *Flast* that the taxpayer plaintiffs had a sufficient stake in the outcome of the litigation to support standing. *Id.*

The Supreme Court has subsequently characterized *Flast* as having created a "narrow exception" to the *Frothingham* bar against taxpayer standing, *Kendrick*, 487 U.S. at 618, and has repeatedly declined to expand its scope. *See Valley Forge*, 454 U.S. at 476-82; *Schlesinger*, 418 U.S. at 228; *Richardson*, 418 U.S. at 175. *Valley Forge* makes the important point that *Flast* did not relax the injury-in-fact and redressability requirements for constitutional standing in Establishment Clause cases and should not be read as a general authorization of all taxpayer claims in the Establish-ment Clause context. *Valley Forge*, 454 U.S. at 488-90. The Court specifically rejected the argument that "enforcement

of the Establishment Clause demands special exceptions from the requirement that a plaintiff allege distinct and palpable injury to himself . . . that is likely to be redressed if the requested relief is granted." *Id.* at 488 (internal quotations and citations omitted).

The majority opinion does not directly address the standing question. Instead, it simply asserts that restitution is appropriate relief here because it would rectify the depletion of the federal Treasury that occurred when the Secretary disbursed the grant money to Notre Dame in alleged violation of the Establishment Clause. Maj. op. at 3. But taxpayer standing under *Flast* is not premised upon injuries to the public fisc; taxpayers in these suits are not vindicating losses sustained by the Treasury. *Flast* left the general principles of *Frothingham* in place: the effect of a congressional enactment on an individual citizen's tax burden is too minute, and a taxpayer's interest in money in the Treasury is too diffuse, to support standing to sue in federal court. Taxpayers have standing under *Flast* to raise Establishment Clause challenges to actions by Congress under the taxing and spending power of Article I, Section 8 for the purpose of halting the unconstitutional exercise of that power. The *Flast* exception to the *Frothingham* bar against taxpayer suits extends no farther than this.

The majority also does not explain how the putative availability of restitutionary relief against a private party intervening defendant can supply standing in a taxpayer suit under *Flast* when the entire case against the government's representative is moot. There is no longer a live controversy against the Secretary of Education for an Establishment Clause violation because there is no remedy that can be ordered against her. The concrete

adversity that existed between the taxpayers and the Secretary when the grant was ongoing evaporated with the expiration of the grant, making the question of the grant's constitutionality a completely academic matter. The taxpayers' standing to pursue their Establishment Clause challenge is now based on—what? A common law claim against Notre Dame for unjust enrichment based on the government's alleged Establishment Clause violation?

Such a claim is unknown to the law, probably because private parties cannot be held liable for Establishment Clause violations. The majority dismisses this rather fundamental objection, asserting that if the taxpayers can prove that "the Department of Education wrongfully took their tax money and gave it to Notre Dame, the district court can order Notre Dame to return the money to the U.S. Treasury." Maj. op. at 5. The majority characterizes this as a "routine instance[ ] of restitution," *id.*, but the doctrine of restitution is entirely incompatible with the limited *Flast* exception to the *Frothingham* bar against taxpayer standing.

Restitution is an elastic doctrine that has both remedial and substantive aspects: it is remedial when invoked as a measure of recovery for an independent civil wrong and substantive when it is the sole source of a defendant's liability. 1 DAN B. DOBBS, THE LAW OF REMEDIES § 4.1, at 552 (2d ed. 1993); Douglas Laycock, *The Scope and Significance of Restitution*, 67 TEX. L. REV. 1277, 1284-85 (1988-1989). Either way, restitution is premised upon unjust enrichment: the conferral of a benefit by the plaintiff on the defendant under circumstances in which the retention of the benefit would be unjust.

As applied to a private party defendant in a *Flast* taxpayer lawsuit, restitution could be classified only as a substantive claim for relief, not merely a type of remedy. Because a

private party cannot violate the Establishment Clause, unjust enrichment would be the only source of the private party's liability in this context. But a federal taxpayer does not by paying his taxes confer a benefit on a federal grant recipient in any meaningful sense; the connection between an individual citizen's tax payment and any given federal grant recipient is nonexistent, or at least far too attenuated to support an unjust enrichment cause of action or provide a basis for standing to sue a private party defendant on an Establishment Clause claim. *See Lujan,* 504 U.S. at 560-61 ("[I]njury in fact" for standing purposes must be "concrete and particularized," not "conjectural or hypothetical"; "fairly trace[able] to the challenged action of the defendant"; and it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." (alterations in original) (internal quotations and citations omitted)). The conceptualization suggested by the majority is inapt; this is not at all "like a case of money received by mistake and ordered to be returned to the rightful owner." Maj. op. at 5. A taxpayer in an Establishment Clause lawsuit based on *Flast* standing does not possess qui tam-like authority to force private parties to return federal grant money to the Treasury.

The majority states categorically that "restitution is among the remedies that a federal court can order for a violation of federal law." Maj. op. at 5. But Notre Dame is not alleged to have violated any federal law. This is a taxpayer suit seeking to enjoin a congressional enactment alleged to violate the Establishment Clause. The majority also asserts that restitution is a "standard remedy" that can be ordered in "public-law as well as private-law cases." Maj. op. at 4. But the two cases cited for this proposition involved suits by the United States to recover costs incurred by the federal government to remediate a private party's violation of a

statutory environmental clean-up duty. *See Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 203-05 (1967) (suit by the United States against shipping company to recover costs incurred by the government in recovering and removing a sunken vessel from a navigable waterway pursuant to 33 U.S.C. § 409, the Rivers and Harbors Act of 1899); *United States v. P/B STCO 213*, 756 F.2d 362, 374 (5th Cir. 1985) (suit by the United States against barge owner to recover costs incurred by the government to clean up an oil spill pursuant to 33 U.S.C. § 1321(f)(1), the Federal Water Pollution Control Act). These cases do not support the majority's theory that an individual federal taxpayer can pursue a restitutionary remedy against a private party for repayment of the Treasury in a lawsuit alleging an Establishment Clause violation by the government.

The majority suggests that the Supreme Court's opinions in *Roemer*, *Lemon II*, and *New York v. Cathedral Academy*, 434 U.S. 125 (1977), demonstrate that there is "no per se rule that the recipient of illegal funds who has spent them cannot be forced to repay them, either in establishment clause cases or in any other class of cases." Maj. op. at 8. This rather overstates the question; in any event, the cases cited do not demonstrate the absence of a rule inhibiting the result the majority achieves here.

*Lemon II* and *Cathedral Academy* simply do not address the question of whether a recipient of government funds can be forced to repay them on a later determination in a taxpayer lawsuit that the appropriation was unconstitutional. In *Lemon II*, private sectarian schools in Pennsylvania incurred expenses in connection with a statutory provision allowing the state to reimburse the schools for certain secular educational services. The expenses at issue were incurred by the schools but had not yet been paid by the

state. The statute was held unconstitutional in *Lemon v. Kurtzman*, 403 U.S. 602 (1971) ("*Lemon I*"), and the question in *Lemon II* was whether to enjoin Pennsylvania from paying the reimbursement claims as a retrospective remedy for the Establishment Clause violation declared in *Lemon I*. The Supreme Court, in a four-justice plurality opinion (with a fifth justice concurring in the judgment), declined to enjoin payment, affirming the district court's order allowing the state to pay the schools' reimbursement claims. *Lemon II*, 411 U.S. at 208-09. *Lemon II* thus permitted a government payment to be made in spite of a constitutional infirmity; this hardly provides a basis for requiring the *return* of money already paid.

*Cathedral Academy* involved a claim by a sectarian school for reimbursement of expenses incurred under a New York statute that had been declared unconstitutional under the Establishment Clause; an injunction prohibiting the payments had been issued by the district court, and the New York legislature responded by adopting a statute permitting payment notwithstanding the injunction. *Cathedral Acad.*, 434 U.S. at 127-28. The school brought suit for reimbursement on the authority of the new statute, and the Supreme Court struck it down on Establishment Clause grounds and disallowed payment of the claim. *Id.* at 133-34. *Cathedral Academy* does not support the majority's position; a decision enjoining a government payment not yet made is not authority for requiring the return of a government grant already disbursed and spent.

Finally, *Roemer* was a three-justice plurality opinion, and the discussion of the plaintiff taxpayers' claim that private sectarian colleges should be forced to refund amounts paid under an unconstitutional pre-*Lemon I* Maryland statute was relegated to a footnote. *Roemer*, 426

U.S. at 767 n.23. The Court simply affirmed the lower court's application of *Lemon II* and declined to order the schools to repay the state, noting that "the separation of church and state may well be better served by not putting the State of Maryland in the position of a judgment creditor of the appellee colleges." *Id.* The taxpayers' claim that the colleges must return amounts already paid was thus rejected in *Roemer*; nothing in the plurality's footnote can be read to suggest that ordering private grant recipients to refund spent grant money is an ordinary and accepted remedy in Establishment Clause cases.

The more important point, however, is that the majority misreads *Lemon II*, *Cathedral Academy*, and *Roemer* as decisions about merits-based factual defenses premised upon reasonable reliance. They were not. *Lemon II* addressed whether *Lemon I* should be applied retroactively—a legal issue that at the time turned on a balancing of equitable interests, including reasonable reliance. *Lemon II*, 411 U.S. at 197-201; *see also Chevron Oil Co. v. Huson*, 404 U.S. 97 (1971). *Cathedral Academy* and *Roemer* involved applications of *Lemon II.* Retroactivity law has changed, *see Harper v. Va. Dep't of Transp.*, 509 U.S. 86 (1993), but the material point for our purposes is that *Lemon I, Cathedral Academy*, and *Roemer* dealt with the legal issue of retroactivity and do not support the majority's holding that restitution from a private party defendant is an available remedy in a taxpayer suit for an Establishment Clause violation, subject only to a merits-based reasonable reliance defense.

The majority posits the example of a $100 million congressional earmark to the Scottish Episcopal Church for ministers' salaries, disbursed in full the day after its enactment. Because an injunction "would come too late to provide any relief to the complaining taxpayers" in this situation, the

majority "cannot think of any reason why [restitutionary] relief should not be possible." Maj. op. at 4. The hypothetical is far-fetched. Assuming such a flagrantly unconstitutional appropriation could escape notice during the entire Article I lawmaking process, any congressman or senator who voted for it would have some serious explaining to do in the next election cycle after it was discovered. The checks and balances of the ballot box are an effective disincentive against such unlikely and obvious congressional misuses of taxpayer money. Separation of powers requires the judicial branch to assume the general competence of Congress to enact laws that are constitutional. The law of taxpayer standing under *Flast* does not now encompass a restitutionary remedy against a private party in an Establishment Clause lawsuit. We need not create one as a hedge against congressional mischief of the sort described in the majority's fanciful hypothetical.

The test for mootness is not an invitation to explore the outer limits of the court's creativity in fashioning a remedy. It is, rather, a practical legal inquiry: within the confines of the recognized causes of action and remedies for which the plaintiff has standing, can the court grant meaningful relief? Here, the answer is no. The majority has expanded taxpayer standing under *Flast* far beyond its existing boundaries and declared a form of relief that was not sought by the plaintiff taxpayers and is not appropriate in Establishment Clause cases. The expiration of the ACE grant moots this case in its entirety. I would affirm the district court's order dismissing the lawsuit.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*